United States District Court
for the
Southern District of Florida

| United States of America, Plaintiff, | ) | |
|---|---|---|
| | ) | |
| v. | ) | Criminal Case No. 17-20907-CR-Scola |
| | ) | |
| Jonathan Diaz, Defendant. | ) | |

## Order on Defendant's Motion to Suppress

Defendant Jonathan Diaz is charged with access with intent to view child pornography and possession of child pornography. (ECF No. 26.) This matter is before the Court on the Defendant's motion to suppress based upon violation of his Fourth and Fifth Amendment rights (ECF No. 23). The Defendant argues that any evidence and statements obtained from him on October 5, 2017 should be suppressed because his home was unlawfully searched and he was unlawfully interrogated by Homeland Security Investigations ("HSI") agents.

The Court held an evidentiary hearing on the Defendant's motion on April 9, 2018. At the hearing, the Court heard the testimony of Government witness Michael Bentolila, and the Defendant, Jonathan Diaz. The Court also reviewed Government exhibits 1 through 5. After considering the credible evidence and testimony and the relevant legal authorities, and for the reasons more particularly set forth below, the motion to suppress (**ECF No. 23**) is **denied**.

### 1. Summary of testimony
#### a. Michael Bentolila

In August 2017, HSI received information that an IP address at 15950 SW 304th Street was receiving, and possibly distributing, child pornography. An individual named Jonathan Diaz resided at that address. Upon review, Diaz's Facebook page showed images of Diaz with a young boy, though not child pornography.

Bentolila has been working for Homeland Security Investigations for fifteen years and is a computer forensic special agent in the cybercrimes division. He sometimes accompanies other agents in the field. On October 5, 2017, Bentolila accompanied agents to the residence on 304th Street. It was their intent to obtain consent to view any computers in the house, as they did not have a warrant.

The four agents arrived at the residence at 6:15 a.m. in three to four unmarked SUV vehicles and parked outside the chain-link fence surrounding the house, in the swale area. Bentolila and the other agents were wearing t-shirts underneath vests with "HSI Police" on the back and a badge emblem on the front. The agents carried sidearms, but none of the officers brandished or took a gun out of its holster. The agents went through the unlocked pedestrian gate and knocked on the front door. A younger female answered the door and said that no one else was in the house. The agents asked to speak to Jonathan Diaz, and she responded that he was at work but that she would call him. She went into the house to make the call and then told the agents that Diaz was on his way. Bentolila does not recall if any agents spoke to Diaz on the phone.

Diaz arrived 20 minutes later, and was told by S.A. Nicole Mederos that the agents had information that there was child pornography in the house, and they wanted to check to make sure there was no child pornography on his computers. Mederos told him that he was not under arrest and was free to leave at any time. Diaz was calm and forthcoming. Diaz told the agents that he was fine with them looking at the computers. Agents Daniel Dargan, Mederos and Bentolila entered the home with Diaz.

Upon entering the home, Diaz was given a form to sign consenting to the search by agents of any electronic media, including phones, computers, CDs and electronic storage devices. Diaz signed the form, which was witnessed by Dargan and Mederos. Bentolila was not present with Diaz when the form was signed, but Diaz had orally given Bentolila consent to search the laptop.

After Diaz signed the form, Bentolila asked Diaz if he had a computer, and Diaz said that he had a laptop. Diaz went to his bedroom and unlocked the door. Bentolila followed him to make sure he did not grab any weapons. Inside the bedroom, Diaz reached down by the side of the bed and grabbed a laptop computer and handed it to Bentolila. Bentolila set his forensic equipment up on the kitchen counter to analyze and retrieve data while maintaining the integrity of the evidence.

Bentolila asked Diaz to turn on the laptop so he could look quickly to see if there was any contraband on it. Diaz turned on the laptop and entered his password. At the time, Mederos and Agent Lopez were outside the home, but Dargan and Agent Amy Shu were in the house. At some point, Diaz's mother came to the house. While Bentolila was looking through the laptop, Diaz made a phone call to a Customs and Border Patrol Agent he knew and that agent agreed to speak briefly with Mederos.

Bentolila offered to take the laptop to his office to conduct the examination, but Diaz wanted the examination to be done in the house. Bentolila hit the "recently played" button on the RealPlayer and saw files

indicative of child pornography files. Bentolila notified Mederos that he had found links to child pornography and the agents decided to interview Diaz. Mederos asked Diaz where he would like to conduct the interview and suggested interviewing Diaz in her vehicle for privacy.

Bentolila was in the back seat, Mederos in the driver's seat and Diaz was in the front passenger seat. Once inside the vehicle, Diaz was told that the agents needed to read him his Miranda rights. He was told he was not under arrest. Mederos read the rights one at a time and asked Diaz to acknowledge that he understood those rights by initialing each right. Diaz initialed each right, and signed the form, which Mederos and Bentolila signed as witnesses. Diaz had no questions and agreed to speak with the agents.

The agents told Diaz that they had found evidence of child pornography on the laptop. Diaz seemed nervous and concerned. Bentolila told him that he had found these files, and they would find child pornography on the computer. Diaz admitted downloading child pornography and knew it was illegal, but denied ever touching any children. Diaz said only he and his sister had access to the laptop.

Before leaving, Bentolila asked if there was anything else in the house that may contain child pornography since they did not want to leave anything behind. Diaz went into the house with Bentolila and gave him an external hard drive, CDs and media cards.

Agents left the home at approximately 8:00 a.m. and took the laptop with them. Mederos gave Diaz her contact information prior to leaving. Diaz's attorney later contacted Mederos, but Bentolila does not know what was discussed. Neither Diaz nor anyone on his behalf ever communicated a revocation of his consent.

### b. Jonathan Diaz

Diaz is 36 years old and resides at 15950 SW 304th Street with his mother and sister. Diaz attended high school, but did not graduate because he did not pass a standardized test. When in school, he took special education classes for a learning disability.

Diaz took an IQ test and claims he scored a 71. He played tackle football for eight years and suffered more than ten concussions. He has never had a brain scan.

At the time of the encounter with agents, Diaz was working as a dispatcher for Sam Patterson Company, a trucking company, for which he has worked for four years.

On October 5, 2017, he was at work when he received a phone call from his sister at around 6:00 a.m. She told him that he had to come home

immediately because there were police officers in the home asking for him. His sister was not at the home but Diaz's niece had called her. He left work and arrived at his house about fifteen minutes later. When he arrived, he saw his home surrounded by undercover police cars and a Miami-Dade County marked police car. The Miami-Dade officer never got out of his car. Diaz claims he was terrified upon seeing all of the agents.

There was debris in front of his house and the cars were parked in the swale area to the side of his house. When Diaz exited his vehicle, he was approached by five agents with their guns visible and dressed in vests that said "Police HSI". The agents told Diaz that there was suspicious activity going on, and that they needed to check it to get him off a list. They did not mention child pornography. Diaz entered the house and the four agents followed him.

Once inside the house, Bentolila told Diaz that he had to go into Diaz's room. He has his own bedroom, which he locks and to which he has the only key. The door was locked, and Diaz was told to open the door. No one told Diaz he did not have to let the agents in the house, that he was free to go, or that he did not have to speak to the agents.

Bentolila initially did not ask Diaz if he had a computer. Once they were in the bedroom, Bentolila checked the bottom part of the modem for a product key and serial number and then told Diaz he had to check the computer. Diaz gave Bentolila the case for the laptop. They then went to the kitchen. Bentolila put the case on the counter, took out the laptop, flipped the laptop over and removed the battery to check the serial number. Bentolila asked if the hard drive had been taken out. Diaz told him "no." Bentolila put the battery back in and turned on the computer, and told Diaz to put in the password, which Diaz did. Diaz then went outside with Mederos. He asked Mederos what the yellow monitor was for, and she told him that it was to take pictures of what was on the computer.

During the search, Diaz called his best friend Mark Morris, a Customs and Border Patrol Officer, to ask him what was going on. Shortly after, the forensic agent came back outside and said he had found something on the computer. Diaz was shown a deleted file on Quicktime and was told the agents needed to talk to him about it. Diaz knew it was a link to child pornography. They went to the car and Diaz was read his rights. Diaz initialed and signed the form. The doors were closed but he did not check to see if they were locked. Diaz answered all the agents' questions. In total, he was in the car for about fifteen minutes.

The forensic agent went from the car into Diaz's room and searched his room. Diaz was in the room and had his hands in his pockets, whereupon one

agent was about to draw his gun and told him to get his hands out of his pockets and leave the room.

The agent removed CDs, a hard drive and micro cards along with the laptop. After all the items were seized, the agents had Diaz sign the Consent to Search form. Prior to executing the form, no agent had requested permission to talk to him, to search the house, to enter his room, to search the computer, or to open the computer. They never told him he had a right to refuse to consent or to refuse to speak to them, or that he was free to leave.

## 2. Analysis

The Defendant argues that he was unlawfully interrogated by HSI agents because he was in custody when the agents went to his house, and therefore, that any of his statements and the evidence subsequently obtained by the agents should be suppressed. (Mot. at 2.) The Government argues that the Fourth Amendment is not implicated, and that any event, under the circumstances in this case, the Defendant was not in custody when they spoke to him and conducted the forensic search of his computer. (Resp., ECF No. 28 at 10-11.)

"The proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure." *Rakas v. Illinois*, 439 U.S. 128, 132 n.1 (1978) (citations omitted). However, if a defendant provides evidence of a "*warrantless* search and seizure, the burden of proof as to the reasonableness of the search rests with the prosecution. The Government must demonstrate that the challenged action falls within one of the recognized exceptions to the warrant requirement, thereby rendering it reasonable within the meaning of the fourth amendment." *United States v. Freire*, 710 F.2d 1515, 1519 (11th Cir. 1983) (emphasis in original) (internal citation omitted).

However, "[t]he Fourth Amendment, which prohibits unreasonable searches and seizures by the government, is not implicated by entry upon private land to knock on a citizen's door for legitimate police purposes unconnected with a search of the premises." *United States v. Taylor*, 458 F.3d 1201, 1204 (11th Cir. 2006) (citing *Coolidge v. New Hampshire*, 403 U.S. 443, 466 (1971)). "It is by now undisputed that the right to *Miranda* warnings attaches when custodial interrogation begins." *United States v. Brown*, 441 F.3d 1330, 1347 (11th Cir. 2006) (citing *United states v. Acosta*, 363 F.3d 1141, 1148 (11th Cir. 2004)). A person is considered to be in custody "when there has been a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Id.* (citing *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (internal quotations omitted). Whether a person is in

custody before a formal arrest "depends on whether under the totality of the circumstances, a reasonable man in his position would feel a restraint on his freedom of movement to such extent that he would not feel free to leave." *Id.* (internal quotations and citation omitted). "The test is objective: the actual, subjective beliefs of the defendant and the interviewing officer on whether the defendant was free to leave are irrelevant . . . [and] under the objective standard, the reasonable person from whose perspective 'custody' is defined is a reasonable innocent person." *United States v. Moya*, 74 F.3d 1117, 1119 (11th Cir. 1996).

The Court finds the testimony of Agent Bentolila to be more credible than the Defendant's testimony. The Defendant was evasive and combative at times. Although he claims to have an IQ of 71, he appeared much more intelligent and expressed himself articulately. He testified regarding logistics and the significance of product keys, and clearly possesses sufficient intelligence to understand his rights and to knowingly waive those rights.

Based upon the evidence presented and the credible testimony, the Court first finds that the Defendant freely, knowingly and voluntarily consented to the search of the electronic equipment in his home. Indeed, he consented to each of the agents' requests during the time that they were at his house. The Defendant returned to his home upon being contacted by his sister, who relayed the message from his niece that law enforcement wanted to speak to him. Once he arrived, the agents asked if they could enter the home with him, to which he consented. He was orally advised of his right to refuse to consent to a search, and voluntarily signed a consent form. In response to further requests from the agents, he unlocked the door to his room, and allowed them to enter and examine his electronic equipment. Thereafter, he voluntarily entered his password and allowed the agents to look at the contents of his computer. He was never restrained, and in fact was permitted to use his phone to call and speak to his friend at Customs and Border Protection. At no time did the agents indicate that he was required to comply with their requests, and although they were armed, they did not draw their weapons or otherwise use force or coercion such that a reasonable person would feel that he was not free to leave. Indeed, Diaz was not in custody when the agents left his home, which is a strong indication that he was not in custody when he met them there upon his arrival.

Although the Defendant was not in custody, and the need for *Miranda* warnings was not triggered, the Court nevertheless finds that the Defendant freely, knowingly and voluntarily waived his *Miranda* rights and agreed to speak with the agents. The Defendant did not testify that he did not understand his rights, or did not agree to speak to the agents. After Agent

Bentolila found evidence of links indicating child pornography on the computer and the agents indicated to the Defendant that they wanted to speak to him, the Defendant agreed to being questioned in the vehicle outside the house. Once inside the vehicle, the agents read the Defendant his *Miranda* rights, to which he indicated his understanding by initialing next to each line and then by signing the form. There was no coercion exerted by the agents. Thus, even if the questioning by the agents could be considered to have been custodial in nature, the Defendant knowingly and voluntarily waived his rights.

### 3. Conclusion

Accordingly, the Court **denies** the Defendant's motion to suppress (**ECF No. 23**).

**Done and ordered** at Miami, Florida on April 25, 2018.

_____
Robert N. Scola, Jr.
United States District Judge